Filed 6/24/21  P. v. Maraglino CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DOROTHY GRACEMARIE MARAGLINO,<br><br>    Defendant and Appellant. | D077746<br><br><br><br>(Super. Ct. No. SCN304686) |

APPEAL from an order of the Superior Court of San Diego County, K. Michael Kirkman, Judge.  Affirmed.

Robert L.S. Angres, under appointment of the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

In October 2015, a jury convicted Dorothy Gracemarie Maraglino of first degree murder (Pen. Code,[1] § 187, subd. (a)), kidnapping (§ 207, subd. (a)), torture (§ 206), and attempted sexual battery by restraint (§§ 243.4, subd. (a) & 664) following the death of Brittany K. in April 2012.  It also convicted Maraglino of a conspiracy to kidnap.  (§ 182, subd. (a)(1).) Maraglino appealed the convictions, and we affirmed the murder, kidnapping, and conspiracy convictions in an unpublished opinion (*People v. Maraglino* (Dec. 29, 2017, D069297, D069609) [nonpub. opn.]) (hereafter *Maraglino*).  The trial court modified the judgment to reverse the convictions for torture and attempted sexual battery.

In 2019, Maraglino filed a petition for resentencing under section 1170.95, which permits a defendant convicted of murder under a felony-murder theory to petition for the conviction to be vacated and resentenced.  (§ 1170.95, subd. (a).)  She contends her petition meets the requirements of section 1170.95 to demonstrate she is entitled to relief, so the court's denial of was improper.  We conclude the trial court properly considered the record of conviction to determine as a matter of law that Maraglino is ineligible for relief under section 1170.95, and we affirm the order.

I

BACKGROUND AND PROCEDURAL FACTS

A.  The Crimes

We take the facts of the underlying conviction directly from our opinion in *Maraglino, supra*, D069297, D069609:

"On April 13, 2012, Perez picked up [Brittany K.] from her apartment under the pretext of taking her on a dinner cruise.  Ten minutes later,

---

[1]     Further unspecified statutory references are to the Penal Code.

[Brittany K.] sent her friend a text message saying, 'Help.' Four days later, detectives recovered her nude body near Lake Skinner in Riverside County. Evidence presented at trial suggested [Brittany K.] died while defendants were acting out a BDSM kidnapping fantasy.

"[Louis Ray] Perez, Maraglino, and [Jessica Lynn] Lopez were active participants in the BDSM lifestyle, respectively occupying roles in their household of 'master,' 'mistress,' and 'slave.' Perez and Maraglino were in a dominant-submissive relationship wherein Perez was the dominant and Maraglino was his submissive. Perez lived in a separate residence but often visited Maraglino at her home in Fallbrook, California. Lopez was Maraglino's slave and lived in Maraglino's home.

"As a masochist, Lopez enjoyed receiving pain; Maraglino would inflict pain on her through BDSM 'play.' Although a slave in the Maraglino household, Lopez had been a dominant in the past and in an ongoing online relationship with someone named Bella. Maraglino was a 'switch,' meaning she was submissive with Perez and dominant with Lopez. Maraglino established written procedures, including a 'House Manual,' 'Perfect Slave Checklist,' and slave contract. She controlled everything Lopez did inside and outside the home; Lopez wore a dog collar stating she was Maraglino's property. As Maraglino's master, Perez had control over Maraglino's household, including control over Lopez.

". . . Although there was testimony Perez was considered a 'safe' player in the BDSM community who acted only with consent, detectives found a video of Perez beating a woman with various implements as she begged him to stop and continuing to beat her past the point of consciousness.

"All three defendants had BDSM abduction, torture, and murder fantasies. . . . Maraglino authored a writing about abducting three

3

generations of women, each one 'prescribed a method of death' and subjected to sexual torture, torture, and forced suicide. Maraglino authored a separate writing, found in Perez's garage, in which she slit the throat of a woman while that woman was having sex with Perez. Maraglino made a handwritten list of 'hunting ground[s]' for vulnerable victims that included ways to dispose of a body and avoid detection. Perez and Maraglino discussed their abduction fantasies with Dora B., another of Maraglino's slaves, on two or three occasions. At one point, Maraglino asked Dora how she would react if a kidnapped woman were brought to the home. Dora worried these fantasies 'didn't always take consent into account,' but she 'wanted to believe that it was nothing more than a fantasy.'

"Perez and Maraglino acted out an abduction fantasy on Nicole A. Without prior agreement, Perez and Maraglino picked up Nicole in a parking lot, blindfolded her, undressed her in the 'dungeon' in the basement of Maraglino's home, restrained her, and engaged in BDSM play. Thereafter, Nicole voluntarily joined the household for a short period as Maraglino's slave.

"Perez and Maraglino had an open relationship, but Maraglino was paranoid about losing him to another woman. Nicole's relationship with Maraglino soured because Nicole communicated with Perez directly, rather than go through her. As their relationship deteriorated, Maraglino made threatening statements toward Nicole's daughter. When Perez began seeing Marina V., Maraglino talked about killing Marina and wanting her to die a torturous death; in an online forum, she threatened to kill Marina and Marina's daughter. Perez and Maraglino briefly broke up over Marina; they soon rekindled their relationship and in 2011 conceived a child.

4

"Although there was some evidence the relationship between Perez and Maraglino became more conventional after they reunited, there was also evidence they remained involved in BDSM. Lopez remained Maraglino's slave. Maraglino kept her BDSM toys and, on the day of [Brittany K.]'s disappearance on April 13, 2012, sent Deborah E. a text message about a forced lactation-torture fantasy. . . .

"[Brittany K.]'s close friend, Elizabeth Hernandez, became friends with Maraglino in 2011. Hernandez would often visit Maraglino's home and bring [Brittany K.] with her. [Brittany K.] and Hernandez were not involved in BDSM, but both knew that defendants were. Although Maraglino was initially friendly with [Brittany K.], she became hostile toward her after she perceived [Brittany K.] flirting with Perez. Maraglino called [Brittany K.] 'the disease' and 'the herpes' when she was not around; asked why Hernandez and [Brittany K.] were always together; and seemingly in jest, offered to get rid of [Brittany K.] for Hernandez. There was some evidence Maraglino wanted to recruit Hernandez into the BDSM lifestyle because Hernandez seemed impressionable and easy to control. On April 13, 2012, the day of [Brittany K.]'s disappearance, Maraglino wrote a letter stating: [¶] 'I Dee [Maraglino] do hereby give to Ivan [Perez] all my grudges and revenge from my birth till now. I release my anger and entrust justice into Ivan's hands. I accept Ivan will decide, design, and dispense the measure of retribution he deems appropriate to my enemies, tormenters, and violators.'

"Lopez appeared to have a better relationship with [Brittany K.], but she, like Maraglino, called [Brittany K.] 'the disease' and 'herpes' and joked, on April 13, 2012, that she would make [Brittany K.] walk the plank at her pool party the next day.

5

"On the afternoon of April 13, 2012, Hernandez visited Maraglino's home to return a camera charger. She stayed to socialize with Maraglino and Perez; Lopez was not home. Maraglino seemed excited to hear [Brittany K.] was going to move to the east coast, saying Hernandez would finally be 'free.' Hernandez told Perez and Maraglino about her recent excursion on the Hornblower dinner cruise in San Diego. She said [Brittany K.] seemed very interested in going, and she wanted to take [Brittany K.] on a cruise before she moved. Hernandez recalled nothing out of the ordinary about her conversation. Perez and Maraglino did not mention having tickets or plans to go on a dinner cruise that evening.

"[Brittany K.] and Hernandez lived in the same apartment complex on Ammunition Road in Fallbrook, as did friends Channy Tal[ ] and Jessica Perry. At 4:38 p.m.[2] on April 13, 2012, Perez knocked on [Brittany K.]'s door. Tal was in the apartment, helping [Brittany K.] pack for her upcoming move. [Brittany K.] asked Perez how he knew where she lived; Perez replied that he had 'asked around.' Perez pressed [Brittany K.] to come with him on the Hornblower dinner cruise that night, saying he had two tickets but nobody to go with. [Brittany K.] declined. Perez gave [Brittany K.] his phone number, and security footage showed him leaving the complex at 4:54. When leaving the apartment, Perez texted Maraglino, 'That guy wasn't successful,' to which Maraglino replied, 'Tomorrow is another day.'

"A few minutes after Perez left, [Brittany K.] texted to ask if he knew anyone who could help move her belongings. At 5:00, Perez texted [Brittany K.], 'Party with me tonight & you'll have five guys there in the morning.' [Brittany K.] replied that she would welcome help moving but felt 'weird about the partying' because she did not think Maraglino would like it.

---

[2]     All times are p.m., unless otherwise noted.

6

"[Brittany K.] told Tal she was uncomfortable accompanying Perez because he was in a relationship with Maraglino. Perez responded to [Brittany K.]'s text, saying Maraglino was 'ok with it' and suggesting at 5:19 that [Brittany K.] text her to confirm. [Brittany K.] replied at 5:26 that she did not know Maraglino's number and did not think Maraglino liked her. Perez reassured [Brittany K.] that was not the case and gave her Maraglino's number. At 5:39, Perez checked in to see if [Brittany K.] had contacted Maraglino. [Brittany K.] replied two minutes later that she had not but would. At 5:42, Maraglino searched the Internet on her phone for 'San Diego dinner cruise.' A minute later, Perez texted [Brittany K.] to say he was 'dressing up to go to dinner on the hornblower.'

"[Brittany K.] called Maraglino and left a voicemail message at 5:55. Maraglino called back ten minutes later, and Tal overheard their conversation. Maraglino seemed friendly and was laughing; she told [Brittany K.] to go with Perez on the cruise because she was pregnant and would get seasick. After speaking with Maraglino, [Brittany K.] decided to go. She told Tal she had no interest in Perez, but thought it would be her last chance to go on the dinner cruise before she moved to Pennsylvania the following week.

"[Brittany K.] texted Perez around 6:10 agreeing to go, asking what time he would pick her up and when his friends would help her move. At 6:12, Maraglino searched the Internet on her cell phone for 'Hornblower San Diego.' Perez sent [Brittany K.] texts at 6:15 and 6:19 asking her to be ready at 7:30 that night and stating his friends would help her move in the morning. At trial, the parties stipulated that on April 13, 2012, the Hornblower cruise left the dock in San Diego at 7:00, meaning it would not

7

have been possible to make it if they left Fallbrook at 7:30, and that Maraglino, Perez, and [Brittany K.] did not have tickets for the cruise.

"[Brittany K.] left Tal phone numbers for Perez and Maraglino, saying she still felt unsure about going. She borrowed two dresses from Tal and got ready to leave. At 6:38, [Brittany K.] texted Hernandez that Perez had stopped by to ask her out and it was 'odd.' Hernandez followed up, and [Brittany K.] texted her at 7:30 that Perez was taking her '[t]o the [H]ornblower and a casino' after Maraglino had given permission. Hernandez testified that this plan confused her because Perez and [Brittany K.] hardly interacted.

"At 7:31, Perez sent [Brittany K.] a text message saying, 'I'm running late be there in five minutes, can you meet me at the curb? I got stopped at the front gate.'³ [Brittany K.] responded, 'At the curb? It's raining you know. Id appreciate it if you drove into the complex.' Perez responded, 'It's not. I don't want to miss our boat.' Perez called [Brittany K.] and evidently agreed to drive up to her complex. Surveillance footage showed Perez entering the complex at 7:36. At 7:37, Perez texted [Brittany K.], 'I'm here,' and [Brittany K.] responded, 'I'm out now.' At 7:39, [Brittany K.] texted Perry that she was going with Perez on a dinner cruise and might stop by to visit Perry afterwards. Surveillance footage showed someone getting into the passenger side of Perez's car; the car pulled out of the lot around 7:40. Perez testified that he then drove [Brittany K.] to Maraglino's home to pick up a flier, and a neighbor recalled Perez's car swerving up to Maraglino's residence near dusk.

---

³    "At trial, Perez admitted he knew there were surveillance cameras in [Brittany K.]'s apartment complex, supporting an inference that he tried to park outside their view when picking [Brittany K.] up.

"At 7:50, ten minutes after leaving her apartment complex with Perez, [Brittany K.] sent Tal a text message that read, 'Help.' [Brittany K.]'s cell phone was closer to Maraglino's house than to her apartment when she sent that text. At 7:57, Perez texted Maraglino, 'Kitten?' At that point, Maraglino and Lopez were shopping at a grocery store located just minutes away from [Brittany K.]'s apartment and about 5 to 15 minutes from Maraglino's home (depending on traffic). Around 7:58, Lopez left the store to retrieve her wallet from Maraglino's home while Maraglino waited at the checkout aisle.

"Around 8:00, Tal tried three times to contact [Brittany K.]. At 8:05, she received a text from [Brittany K.]'s phone stating, 'Yes I love this party.' Tal was suspicious because the message did not resemble [Brittany K.]'s texts. She demanded [Brittany K.] call her so she could hear her voice. Tal received another suspicious text message from [Brittany K.]'s phone at 8:07 that said, 'In a few hot guys.' Tal insisted [Brittany K.] call her immediately, and [Brittany K.]'s phone made two short calls to Tal at 8:09 and 8:10. Tal texted [Brittany K.] that she could not hear her when she called, and [Brittany K.]'s phone sent Tal a message stating, 'Its ok music is too loud.' At trial, Perez admitted using [Brittany K.]'s phone to call her friends while playing loud background music from his car.

"Meanwhile, Maraglino, who remained at the grocery checkout aisle, left missed calls on Lopez's phone at 8:07 and 8:09. At 8:10, Maraglino stepped outside and returned a few seconds later with Lopez. At 8:11, Perez texted Maraglino, 'Come home,' suggesting he was then at Maraglino's home. At 8:12, Lopez and Maraglino were seen on video leaving the grocery store.

"[Brittany K.]'s friends grew very concerned. At 8:14, Hernandez called [Brittany K.]; cell location data placed [Brittany K.]'s phone near Maraglino's house at that time. At 8:21, Hernandez called Maraglino, who lied that she

9

had not spoken to [Brittany K.] that day.  At 8:30, Tal texted [Brittany K.], demanding she call her.  At 8:40, Perry called Perez, who told her he had left [Brittany K.] downtown at a club.  Perez told Perry he had last seen [Brittany K.] talking to some guys outside the club.  He kept repeating that [Brittany K.]'s face looked okay, which struck Perry as odd.  Cell location data indicated Perez and Lopez were both in the vicinity of Maraglino's home in Fallbrook up to this point.

"Maraglino, who previously worked for a cell phone company, told Perez that cell phones were traceable.  Perez then decided to dispose of [Brittany K.]'s phone in downtown San Diego to corroborate the story he had told Perry.  At 9:20, cell location data showed Perez driving southbound from Fallbrook toward San Diego.  Perez had [Brittany K.]'s phone with him.  While driving south on the I–15, Perez texted [Brittany K.] 'Where are you?' and 'You're friends are calling me worried.'  He texted Maraglino asking about her night, and Maraglino replied that she was having a quiet night at home.  Perez later admitted to using [Brittany K.]'s phone to send text messages to her friends.  At 10:10, Tal tried again to call [Brittany K.] and texted, 'Should I just call the cops.'  [Brittany K.]'s phone responded from a downtown San Diego location, 'Im ok.'  Perez's license plate was photographed downtown by a San Diego Police Department license reader at 10:34.  Perez's phone and [Brittany K.]'s phone remained downtown until 10:51, when Perry tried again to reach [Brittany K.].

"At 11:02, Perez called Perry as he was driving north from San Diego toward Fallbrook.  Perez sounded frantic and told Perry he had been driving around looking for [Brittany K.].  Perez returned to Maraglino's home after midnight.  Thereafter, cell data showed Perez's and Lopez's cell phones moving east toward Temecula.  In the early hours of April 14, both Perez's

10

and Lopez's cell phones were traced near Lake Skinner and later traced returning toward Maraglino's home. At trial, Perez explained that he and Lopez wrapped [Brittany K.]'s corpse in a tarp and put it in a trailer that they hitched to Perez's car. Perez drove the trailer to Lake Skinner, with Lopez tailing his car to cover the trailer's missing license plate, and the two dumped the body near Lake Skinner.

"On the morning of April 14, Hernandez confronted Maraglino, saying she knew Maraglino had spoken to [Brittany K.] the previous day. Maraglino stuttered and gave the phone to Perez. During the call, Perez changed his story two or three times as to what had happened the previous night.

"Tal and Hernandez went to search for [Brittany K.] in her apartment; when they did not find her, they called the sheriff's department. Perez called Hernandez around noon and offered to drive her around to look for [Brittany K.]; Hernandez told him law enforcement had already arrived. Sheriff's Deputy James Breneman called Perez, who sounded panicked but offered to come talk in person.

"Perez drove to [Brittany K.]'s apartment complex on the afternoon of April 14. After he parked, surveillance footage showed him doing something inside his right rear passenger door. Perez told detectives [Brittany K.] was flirty, flighty, and that she had been drinking; [Brittany K.]'s friends did not agree with these characterizations. Perez claimed he had left [Brittany K.] downtown at a club the night before and that [Brittany K.] had texted him, 'I'm okay.' Deputy Breneman was suspicious when he did not find that text on Perez's phone. He also found it strange that Perez's car was caked with fresh mud, given the heavy rains the night before. Perez agreed to provide a voluntary statement at the sheriff's department and was transported there. He consented to a search of his vehicle and was placed under arrest when

11

deputies found an unlawful weapon inside. Later that afternoon, someone turned in [Brittany K.]'s phone in downtown San Diego.

"Deputies searched Maraglino's home on April 15 and 16. On April 16, Lopez and Maraglino were gone, and some items seen the previous day were missing, as if someone had cleaned up. The sheriff's department authorized a search for Maraglino's truck, which bore the license plate, 'Ivnsktn ('Ivan's Kitten,' indicating Maraglino was Perez's 'Kitten'). Deputies found the truck on April 17 at a hotel parking lot near the San Diego airport. They forcibly opened a room booked under Maraglino's name and found Lopez, bleeding at the neck and half naked after an apparent suicide attempt. In the room were three copies of a seven-page handwritten confession letter by Lopez, with a sign above stating, 'Pigs read this.'

"In the letter, Lopez used derogatory language, describing [Brittany K.] as a 'miserable cunt' who had tried to come between Perez and Maraglino. Lopez took complete responsibility for [Brittany K.]'s death, saying sheriffs had arrested the 'WRONG FUCKING PERSON' in Perez. Lopez claimed she alone had grabbed [Brittany K.]; slammed her body into the stairs; restrained her wrists, ankles, and mouth; subdued her with a Taser; wrapped rope around her neck to apply and release pressure; attempted to hack up the body with power tools; doused the body with bleach; and dumped the body near Lake Skinner. The letter described injuries that would likely be found on [Brittany K.]'s body—ligature marks around her neck and wrists, a Taser mark near her neck, and bruising and mutilation marks.[4] Lopez expressed her love to Maraglino as her slave and pet; sheriffs found a dog collar in the

_____

[4] "The letter also contained statements that did not correspond with other evidence, including that the murder happened after 11:15 and that [Brittany K.], who did not drive, appeared suddenly at the residence to demand sex with Perez.

12

room marking Lopez (alias Rosalin) as 'Property of Ms. Dee [Maraglino].' There were three copies of the confession letter in the hotel room, one addressed to 'Master Ivan' (Perez), another to 'My parents' and a third to a local media station. Surveillance video showed the hotel receptionist making copies of the letter for Lopez the previous night. Maraglino was in the hotel when Lopez had her letter copied and departed San Diego on the morning of April 17 to visit family in Virginia. Deputies accompanied Lopez to the hospital, and she was arrested thereafter.

"Based on Lopez's letter, deputies focused their search team on the Lake Skinner area in Riverside County. Later that afternoon on April 17, deputies found [Brittany K.]'s nude body about a mile from Lake Skinner. The medical examiner determined the cause of death to be ligature strangulation, with hemorrhaging in her eyes consistent with pressure being intermittently applied and released over a long period. The cricoid cartilage of [Brittany K.]'s neck had been fractured, indicating someone had applied more than 33 pounds of pressure on her neck. There were bruises on her legs, a bruise outside her left wrist consistent with the use of handcuffs, two cuts forming a 'T' on her left wrist, and five small pinprick marks on the left side of her face, consistent with the use of a stun baton. In addition, there was a deep postmortem cut to [Brittany K.]'s left knee with marks consistent with the use of a power saw. The lack of maggots was consistent with the wound having been doused with bleach. There were postmortem abrasions on [Brittany K.]'s back, consistent with the body being rolled down the embankment. There were no internal or external injuries to [Brittany K.]'s genitalia.

"As lead sheriff's detective Brian Patterson was driving to Lake Skinner on April 17, Maraglino called him to say that she and Lopez ordered

13

a movie on cable on April 13 called 'Adventures of Rin Tin' and had spent the night in. Her cable records later indicated she rented 'Tintin' on April 14 and did not rent any movies on the 13th. Maraglino hung up after Patterson pressed her on inconsistencies with Perez's account, insisting that he could not get her to contradict Perez.

"Officers searched Maraglino's home again on April 19. They recovered the roll of plastic mentioned in Lopez's letter and photographed a reciprocating saw blade in a drawer near the hallway. They also recovered various images, videos, documents, and BDSM implements from the home.[5] Officers recovered a release of liability form in which Maraglino stated she voluntarily engaged with Perez in BDSM activities, including whipping, beating, and asphyxia, and that she relieved Perez of 'injuries or loss of life that may result.' They also recovered the April 13, 2012 writing in which Maraglino released her anger to Perez and entrusted him to deliver justice and retribution. Maraglino was arrested in May 2012.

"A later search of Perez's vehicle revealed a plastic bag containing food wrappers, disposable gloves, a piece of plastic, and a stun baton in working condition. There was blood on the plastic gloves, pieces of plastic, and the plastic bag matching [Brittany K.]'s DNA. Swabs from the piece of plastic and the gloves matched Perez's DNA. The stun baton contained Perez's DNA on the straps and handle and [Brittany K.]'s DNA on the prongs. There was no semen found in Perez's car. Tire treads from Perez's car were a possible match to the treads found near [Brittany K.]'s body at Lake Skinner.

---

[5]     "Among these was the 'Deed to Dee' and 'Perfect Slave' documents, found in the room Maraglino was setting up as a nursery. At trial, Maraglino's counsel presented evidence that the 'Deed to Dee' document was found in a broken glass frame at the bottom of a closet to show that Perez and Maraglino had ceased participating in BDSM by April 2012.

"Sheriff's deputies ultimately found no evidence of blood or semen at Maraglino's home. They recovered a rope and knife from Maraglino's truck but could not connect those items to [Brittany K.]'s murder. They also recovered from Maraglino's truck a receipt for cleaning products, water, paper towels, and rubber gloves purchased on April 14.

"A special agent with the Naval Criminal Investigative Service searched Perez's home on base and found additional BDSM writings, including Maraglino's throat-slit fantasy writing. Maraglino's cell phone was found a year and a half later, cleared of text data, disassembled, and underneath several suitcases in a closet in her brother's house in Missouri. The clothes worn by Maraglino, Perez, and [Brittany K.] on April 13 were never recovered.

"At trial, Perez admitted he had lied to Perry and detectives about taking [Brittany K.] downtown, and he admitted taking [Brittany K.]'s cell phone downtown to match that story. He claimed he had lied to protect Maraglino but denied doing so to give her more time to clean up. Perez admitted he had misled [Brittany K.] into believing they were going on a cruise long after they had already missed it in order to get her into his car. He also admitted telling Becky Z. on October 17, 2013, 'everybody had a role to play that night, including myself.' On redirect, Perez explained this statement referred only to his role in the cover-up and that he had also told Becky, 'I didn't kill anybody.'

"[¶] . . . [¶]

"[¶] . . . [¶]

"[¶] . . . [¶]

"... .Maraglino called to the stand her obstetrician and argued she had put her BDSM activities on hold since becoming pregnant and had no role beside assisting in the cover up. . . .

"Following deliberations, on October 21, 2015, the jury convicted Perez and Maraglino of all counts and found true the kidnapping special circumstance allegation . . . .

"[¶] . . . [¶]

"In her sentencing brief, Maraglino filed a motion to set aside the true finding on the kidnapping special circumstance and argued an LWOP sentence would violate her Eight Amendment rights. The court denied Maraglino's motion and, on November 19, 2015, sentenced Maraglino and Perez to LWOP on count 1 [first degree felony murder with a kidnap special circumstance] and life without the possibility of parole on count 4 [torture]. The court imposed a determinate term of an eight-year upper term for count 2 [conspiracy to commit kidnap], a stayed term for count 3 [kidnapping] pursuant to section 654, and a consecutive six-month term for count 5 [attempted sexual battery by restraint]." (*Maraglino*, *supra*, D069297, D069609.)

### B. The Direct Appeal

Maraglino appealed her conviction. She challenged, among other things, the sufficiency of the evidence supporting the convictions and the true findings on the kidnapping special circumstance. (*Maraglino*, *supra*, D069297, D069609.) We issued our opinion in December 2017, and we found insufficient evidence to support Maraglino's convictions for torture and attempted sexual battery by restraint. However, we concluded that substantial evidence supported the other convictions and special circumstance findings, and we affirmed those convictions. (*Ibid.*)

16

We specifically concluded there was sufficient evidence that Maraglino aided and abetted the kidnapping and that she conspired to kidnap. (*Maraglino*, *supra*, D069297, D069609.) We explained: "The jury could infer Maraglino and Perez planned the Hornblower ruse after Hernandez stopped by and mentioned [Brittany K.]'s interest in going. Maraglino searched the Internet for 'dinner cruise' and 'Hornblower San Diego' after Hernandez left and while Perez was trying to convince [Brittany K.] to go. Maraglino then *lured* [Brittany K.] to accompany Perez. [Brittany K.] told Perez she was reluctant to party with him and would 'need [Maraglino] to say it was ok' to go. She expressed similar reservations to Tal. On Perez's urging, she called Maraglino. Maraglino laughed and told [Brittany K.] to go use her ticket because she was pregnant and would get seasick. [Brittany K.] told Tal she decided to go after speaking to Maraglino and texted Perez, 'Ok I talked to dee [Maraglino] and she [said] she was good with it so i[']ll go.' The jury could infer that [Brittany K.] would not have gone without Maraglino's encouragement." (*Ibid.*)

We also explained there was evidence the jury could have considered to infer consciousness of guilt and motive evidence. (*Maraglino*, *supra*, D069297, D069609, citing *People v. Cooper* (1991) 53 Cal.3d 771, 833; *People v. Thornton* (2007) 41 Cal.4th 391, 438-439.) In particular, we noted that Maraglino had previously worked for a cell phone company and told Perez how the data could be traced, prompting him to dispose of Brittany K.'s phone downtown, and that items went missing from Maraglino's home between the first and second searches. (*Maraglino*, *supra*, D069297, D069609.) And we explained that Maraglino was paranoid about losing Perez to another woman and believed Brittany K. had been flirting with him,

17

that she referred to Brittany K. as a disease and offered to get rid of her, and that she seemed happy about Brittany K.'s pending move. (*Ibid.*)

We also expressly concluded there was "ample evidence supporting her culpability for kidnapping as a direct aider and abettor and as a conspirator with Perez." (*Maraglino, supra,* D069297, D069609.) And we concluded that the kidnapping conviction alone was sufficient to sustain her first degree felony murder conviction, and that there was sufficient evidence to support the jury's true findings as to the kidnapping special circumstance. (*Ibid.*)

We next explained that "where an aider and abettor of felony murder lacks the intent to kill, section 190.2, subdivision (d) 'imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference with human life' to convict of special-circumstances murder eligible for death. [*People v. Banks* (2015) 61 Cal.4th 788, 798 (*Banks*).] The California Supreme Court defined both of those elements—'major participant' and 'reckless indifference to human life'—in *Banks.*" (*Maraglino, supra,* D069297, D069609.) We discussed *Banks,* noting that under that guidance, a jury considers the totality of the circumstances and considers several factors, which we detailed. (*Ibid.*) We also explained reckless indifference, as defined and discussed in *People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*). (*Maraglino, supra,* D069297, D069609.) Then, using those definitions, we explained:

> "There is sufficient evidence to support the inference Maraglino was a major participant in the kidnapping. [Brittany K.] made it clear she would not accompany Perez on the dinner cruise without Maraglino's approval. Maraglino provided essential assistance, convincing [Brittany K.] to accompany Perez. The jury could infer she helped plan the kidnapping conspiracy shortly after Hernandez came and told them about her recent experience on the Hornblower cruise. After [Brittany K.] initially declined the invitation, Perez texted Maraglino, 'That

18

guy wasn't successful,' and Maraglino responded, 'Tomorrow is another day.' As Perez was trying to convince [Brittany K.] to go on the cruise, Maraglino was searching the Internet on her phone for 'dinner cruise' and 'Hornblower San Diego.'

"After the 'Help' text, when Hernandez called Maraglino worriedly, Maraglino denied having spoken to [Brittany K.]. That night, she told Perez to get rid of [Brittany K.]'s cell phone downtown. She later tried to hide her role, telling detectives she had only let [Brittany K.] get Perez's help for the move, not go out with him. Maraglino deleted her text messages, disassembled her cell phone, and hid it in the bottom of a closet in her brother's house in Missouri. She was at the hotel when Lopez penned her confession letter and flew to Virginia while Lopez attempted suicide in the hotel room. Based on the totality of circumstances, the jury could reasonably find Maraglino was a major participant in criminal activities known to pose a grave risk of death [citation].[ ]

"There is sufficient evidence from which the jury could find Maraglino acted with reckless indifference to human life under *either* a subjective or objective standard. The jury could reasonably find Maraglino knowingly created a grave risk of death, beyond the risk posed in aiding any kidnapping. This was no ordinary kidnapping; it was a BDSM-related kidnapping to fulfill shared sexual fantasies. Maraglino and Perez fantasized about kidnapping a person without consent and beating, raping, and killing her. She had a video in her possession showing Perez continuing in extreme BDSM activity with a woman past the point of consciousness. Her fantasy writings involved abduction, torture, and murder. Maraglino signed a release of liability form indicating her awareness that BDSM activities with Perez could result in 'loss of life.' She also authored a document on the day of [Brittany K.]'s murder releasing her anger to Perez and entrusting justice in his hands.

"Likewise, under an objective standard, the jury could find that a reasonable person in Maraglino's situation would have recognized the risk her actions posed to [Brittany K.]'s life. Maraglino knew Perez's sexual interests and the risks of engaging in BDSM with him, and the jury could infer she was

19

home during [Brittany K.]'s prolonged restraint. [Citation.] Given the fantasies they shared, the jury could infer a reasonable person would know Perez's likelihood to kill [Brittany K.]. [Citation.] There is no indication Maraglino tried to minimize the risk of violence during the kidnapping. [Citation.] Given her dislike of [Brittany K.] and letter entrusting justice to Perez, the jury could infer a reasonable person would have recognized an elevated risk to human life beyond the risk apparent in any kidnapping [Citation.]"

(*Ibid.*)

We also directly compared Maraglino's involvement in the crimes here to the conduct of Banks and Clark in those respective cases and explained that her involvement was substantially greater than the one Banks played, and that unlike the plan in *Clark*, here a jury could properly find a reasonable person would have foreseen the risk to Brittany K. beyond a risk apparent in a kidnapping. (*Maraglino, supra*, D069297, D069609.)

C. The Section 1170.95 Petition

Maraglino filed a petition for relief under section 1170.95. Her petition asserted that she was convicted of a theory of felony murder or murder under the natural and probable consequences doctrine, that she did not personally kill anyone, that she did not aid and abet the killer, and that her conduct did not reach the level of a major participant in a crime who acted with reckless indifference to human life. The petition also noted our conclusions on the direct appeal, but contended that the conviction "was sole[l]y based on felony murder due to [the appellate court's] mi[]sinformation regarding the communication between Petitioner and [Brittany K.]." It identified other facts presented to the jury and maintained that those facts disputed the conclusion that she knew Brittany K. would miss the Hornblower cruise. Maraglino argued that because "the jury and Appellate Court based their conviction on the belief that Petitioner knew that Perez and [Brittany K.]

20

would miss any cruise on Hornblower and the fact that the court documents dispute this, Petitioner ask[s] the court to examine the case for resentencing."[6]

The court denied the initial petition without prejudice for failure to file a declaration stating she had complied with all the requirements of section 1170.95, subdivision (a). Maraglino refiled her petition in May 2019. The People filed an initial response to the petition, contending that Maraglino could not meet her prima facie burden of showing she could not be convicted of first or second-degree murder because of the changes to the Penal Code. And Maraglino's attorney filed a motion and corresponding points and authorities in August 2019, maintaining Maraglino was not the actual killer and did not physically participate in the kidnapping. It also argued there was insufficient evidence that Maraglino was a major participant who acted with reckless indifference to human life.

At the hearing on the matter, the trial court read extensively from our opinion before concluding that Maraglino failed to make a prima facie case that she was entitled to relief under section 1170.95.

II

DISCUSSION

Maraglino makes two arguments. First, she contends it was improper for the trial court to consider any information outside the section 1170.95 petition in determining whether she had met her prima facie burden. Second, she contends that even had the court considered facts outside the petition, like the record of conviction, she met her burden because, she

---

[6] Maraglino filed a habeas petition with the superior court in January 2019 raising many of the same factual claims she raised in her petition for resentencing under section 1170.95.

alleges, a question remains about whether she could still be convicted of felony murder under the Supreme Court interpretations in *Banks* and *Clark* of what it means to be a "major participant" in the felony who shows a "reckless indifference to human life."

## A. Penal Code Section 1170.95

On January 1, 2019, Senate Bill No. 1437's addition of section 1170.95 and amendments to sections 188 and 189 became effective. (See Stats. 2018, ch. 1015, § 4.) Section 188 now reads: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Section 189, subdivision (e) now reads: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a)[7] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[8]

---

7 Section 189, subdivision (a) includes murder committed in the perpetration or attempted perpetration of kidnapping.

8 Section 190.2, subdivision (d) provides that a defendant who is not the actual killer but who is a major participant in a felony listed in subdivision (a)(17) that results in death, and who acts with a reckless indifference to human life, can be punished by death or life without parole if a special circumstance in subdivision (a)(17) is found true. Kidnapping is an enumerated felony listed in subdivision (a)(17).

22

Section 1170.95 created a petition process that permits a defendant convicted of murder under a felony-murder theory to petition for the conviction to be vacated and to be resentenced.  (§ 1170.95, subd. (a).)  Section 1170.95 requires the trial court to determine whether the petitioner has made a prima facie showing that the prosecution proceeded under a felony-murder theory or the natural and probable consequences doctrine, the jury convicted the petitioner of first or second degree murder, or the petitioner accepted a plea instead of having a trial in which the petitioner could be convicted of first or second degree murder, and the petitioner could not be convicted of first or second degree murder presently in light of changes to section 188 or 189, which became effective January 1, 2019.  (See § 1170.95, subd. (a); *People v. Verdugo* (2020) 44 Cal.App.5th 320, 326 (*Verdugo*), review granted Mar. 18, 2020, S260493.)

If a review of the facial sufficiency of the petition shows it does not comply with requirements, the trial court may deny it without prejudice. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 975-976 (*Drayton*); § 1170.95, subd. (b)(2).)  To determine if a prima facie case for relief has been shown, the court should ordinarily appoint counsel and receive briefing from the People and from the petitioner.  (§ 1170.95, subds. (c), (d)(1) & (3).)

The trial court may review the record of conviction to determine if the form allegations in the petition are correct.  This may demonstrate ineligibility if the petitioner was convicted on a ground that remains valid after Senate Bill No. 1437's amendments to sections 188 and 189.  (*Verdugo*, *supra*, 44 Cal.App.5th at p. 330, review granted; *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1136, fn. 7, 1137-1138, review granted Mar. 18, 2020, S260598.)  Although the authority to review the record "is limited to readily ascertainable facts from the record (such as the crime of conviction), rather

23

than factfinding involving the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime)," the court does not need to "credit factual assertions that are untrue as a matter of law— for example, a petitioner's assertion that a particular conviction is eligible for relief where the crime is not listed in subdivision (a) of section 1170.95 as eligible for resentencing." (*Drayton*, *supra*, 47 Cal.App.5th at p. 980.) If the record, without weighing evidence, shows the petitioner is not entitled to relief as a matter of law, the court can deny the petition without an order to show cause. (See *ibid*; see § 1170.95, subd. (c) [order to show cause issues if petitioner makes prima facie showing of entitlement to relief].)

If the court issues the order to show cause, it holds a hearing to determine whether to vacate the murder conviction and recall the sentence and resentence the petitioner on the remaining counts. (§ 1170.95, subd. (d)(1).) At that hearing, the burden is on the prosecution to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (*Id.*, subd. (d)(3).)

B.  The Meaning of "Major Participant" Acting with "Reckless Indifference to Human Life"

In 2015 and 2016, our Supreme Court "clarified 'what it means for an aiding and abetting defendant to be a "major participant" who acted with a " 'reckless indifference to human life.' " (*In re Taylor* (2019) 34 Cal.App.5th 543, 546.) In *Banks*, the court identified certain factors to consider in determining whether a defendant was a major participant (*Banks*, *supra*, 61 Cal.4th at p. 803); *Clark* identified factors to determine whether the defendant acted with reckless indifference to human life (*Clark*, *supra*, 63

Cal.4th at pp. 618-623).  The court clarified that the focus should be on the defendant's personal role in the crimes leading to a victim's death, and "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Banks,* at p. 801.)  The Supreme Court identified several factors:  knowledge of weapons and use and number of weapons, physical presence at the crime and opportunities to restrain the crime and/or aid the victim, duration of the felony, defendant's knowledge of the other perpetrators' likelihood of killing, and the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, at pp. 618-623.)

## C.  Use of Record of Conviction

Maraglino's arguments present questions of statutory interpretation, which we review de novo.  (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

The statute separates facial sufficiency requirements in section 1170.95, subdivision (b)(2) from the requirements for a prima facie evaluation in subdivision (c), prescribing two court reviews before an order to show cause issues, "one made before any briefing to determine whether the petitioner has made a prima facie showing he or she falls within section 1170.95—that is, that the petitioner may be eligible for relief—and a second after briefing by both sides to determine whether the petitioner has made a prima facie showing he or she is entitled to relief."  (*Verdugo*, *supra*, 44 Cal.App.5th at p. 328, review granted.)  Subdivision (c) "contemplates a more substantive review by the trial court. . . ."  (*Drayton*, *supra*, 47 Cal.App.5th at p. 974.)  Here, the court had the benefit of briefing when it determined that Maraglino had not met her prima facie burden of demonstrating she was entitled to relief.

25

Maraglino's contention that a prima facie review should exclude readily ascertainable facts so that a petitioner can reopen the factual allegations and findings of a jury on appeal ignores the court's limited role under this process. The court considers relief eligibility as a matter of law; it does not engage in any fact-finding or reconsider whether the evidence supports a special circumstance finding by the jury.[9] The record of conviction provides the court with factual information to help ascertain whether the petitioner is ineligible for relief as a matter of law, with all inferences in the petitioner's favor. (*Verdugo*, *supra*, 44 Cal.App.5th at p. 329, review granted.) It would not be reasonable to ignore a jury's finding of special circumstances to reach an inference that a petitioner was not a major participant who acted with reckless indifference to human life when the verdict demonstrates clearly that the petitioner was indeed a major participant who acted with reckless indifference to human life as those terms are defined in *Banks* and *Clark*.

D. Maraglino was a Major Participant Who Showed Reckless Indifference

Maraglino next contends that the trial court erred in relying on our findings in *Maraglino* that sufficient evidence supported the kidnapping special circumstance finding she was a major participant in the kidnapping who acted with reckless indifference to human life. She maintains that multiple courts have concluded that a murder defendant whose conviction includes a special circumstance finding is not precluded as a matter of law

---

[9]     The People ask us not to follow *People v. Torres (*2020) 46 Cal.App.5th 1168, review granted June 24, 2020, S262011 (*Torres*) and *People v. York* (2020) 54 Cal.App.5th 250, review granted Nov. 18, 2020, S264954 (*York*)*,* cases which have concluded a defendant need not file a habeas petition to challenge a special circumstances verdict in order to reopen questions of fact that may indicate entitlement to relief under section 1170.95. We do not reach this issue because, as we explain *post*, the record of conviction makes clear that Maraglino was not eligible for relief under section 1170.95.

from obtaining relief under section 1170.95. This may be true in some circumstances, but it is not true under the circumstances of Maraglino's case.

The cases Maraglino cites address jury verdicts and direct appeals that predate the Supreme Court's opinions in *Banks* and *Clark*. (*Torres*, *supra*, 46 Cal.App.5th at p. 1177, review granted [jury's findings in 2001]; *People v. Smith* (2020) 49 Cal.App.5th 85, 93, review granted July 22, 2020, S262835 [verdict in 1994]; *York*, *supra*, 54 Cal.App.5th at pp. 257-258, review granted [1994 verdict].) Thus, neither the juries' special circumstance findings nor the direct appeals considered the meanings of "major participant" who acts with a "reckless disregard for human life" as those terms are currently understood post-*Banks* and *Clark*.

The case before us is distinguishable. Maraglino argued in her direct appeal that there was insufficient evidence that she acted with intent to kill or that she was a "major participant" in the kidnapping who acted with "reckless indifference to human life" as those words have been clarified in *Banks* and *Clark*. (*Maraglino*, *supra*, D069297, D069609.) Although there was no special jury instruction that referenced the factors from *Banks* or *Clark*, as Maraglino acknowledges, we reviewed her case on direct appeal in 2017 and found there was sufficient evidence to support the special circumstances conviction utilizing the factors detailed in *Banks* and *Clark*.

Specifically, we noted the Supreme Court's definition of " 'major participant' " and " 'reckless indifference to human life' " in *Banks*, explaining a major participant must have involvement that is substantial and greater than the actions of an ordinary aider and abettor to an ordinary felony murder. (*Maraglino*, *supra*, D069297, D069609, quoting *Banks*, *supra*, 61 Cal.4th at pp. 801, 802.) We explained that a jury considers the "totality of the circumstances," and we identified the factors outlined in *Banks*: the

27

defendant's role in planning; the defendant's role in supplying or using lethal weapons, the defendant's awareness of the particular dangers posed by the crime; weapons used, or past experience or conduct of other participants; whether the defendant was present at the killing and in a position to facilitate or prevent the death; and the defendant's actions after lethal force was used. (*Maraglino*, *supra*, D069297, D069609, quoting *Banks*, *supra*, 61 Cal.4th at pp. 802, 803.)

We also addressed the standards used to assess reckless indifference to human life, explaining that under a subjective standard, there must be evidence that a defendant appreciated her acts would likely result in the taking of innocent life, and under the objective standard, we ask what a law-abiding person would do in the defendant's situation. (*Maraglino*, *supra*, D069297, D069609.) Then, we explained why there was sufficient evidence to support Maraglino's role as a major participant, "provid[ing] essential assistance, convincing [the victim] to accompany Perez." (*Ibid.*) We noted that Maraglino was the one who convinced the victim to accompany Perez, that she lied to Brittany K. about her own (nonexistent) recent experience on the cruise, and that she researched information about the cruise that she was trying to convince the victim to accompany Perez on. (*Ibid.*) Maraglino also directed Perez to get rid of the victim's cell phone, tried to hide her role, deleted text messages, and disassembled her phone and hid it out of state. And she was present when Lopez penned the confession but left town while Lopez attempted suicide. (*Ibid.*) We cited *Banks* when we concluded that "based on the totality of the circumstances, the jury could reasonably find Maraglino was a major participant . . . ." (*Ibid.*)

We also concluded there was sufficient evidence from which a jury could find Maraglino acted with reckless indifference to human life under

28

either the subjective or objective standard. (*Maraglino*, *supra*, D069297, D069609.) We explained why she subjectively acted with reckless indifference: " The jury could reasonably find Maraglino knowingly created a grave risk of death, beyond the risk posed in aiding any kidnapping. This was no ordinary kidnapping; it was a BDSM-related kidnapping to fulfill shared sexual fantasies. Maraglino and Perez fantasized about kidnapping a person without consent and beating, raping, and killing her. She had a video in her possession showing Perez continuing in extreme BDSM activity with a woman past the point of consciousness. Her fantasy writings involved abduction, torture, and murder. Maraglino signed a release of liability form indicating her awareness that BDSM activities with Perez could result in 'loss of life.' She also authored a document on the day of [the victim]'s murder releasing her anger to Perez and entrusting justice in his hands." (*Ibid*.)

We cited to Clark when we concluded that under the objective standard, "a reasonable person in Maraglino's situation would have recognized the risk her actions posed to [the victim]'s life. Maraglino knew Perez's sexual interests and the risks of engaging in BDSM with him, and the jury could infer she was home during [the victim]'s prolonged restraint. [Citation.] Given the fantasies they shared, the jury could infer a reasonable person would know Perez's likelihood to kill [the victim]. [Citation.] There is no indication Maraglino tried to minimize the risk of violence during the kidnapping. [Citation.] Given her dislike of [the victim] and letter entrusting justice to Perez, the jury could infer a reasonable person would have recognized an elevated risk to human life beyond the risk apparent in any kidnapping. [Citation.]" (*Maraglino*, *supra*, D069297, D069609.)

It is clear from the record of conviction that Maraglino is ineligible for relief under section 1170.95 because she was a major participant who acted with a reckless indifference for human life.  Accordingly, the trial appropriately denied the petition.

DISPOSITION

The order is affirmed.

HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

30